Before we begin our regular order today, I feel compelled to do this, although it's hard for me. We often talk about our law clerks when they're leaving and give a little summary and it's emotional for us because we become very close to our clerks in the year or two they serve with us. But today is just monumentally beyond that because this will be the last time that I sit with my friend Reggie Walker and I'm still fighting with him so I'm hoping he still won't leave. So if I have to take this back someday, I'm more than happy to take it. But it's just a very emotional thing and I speak I know on behalf of all of the judges on our court. We were Reggie's second career. He served in the Navy for 20 years before he came here and even though he's pretending and he's calling it retirement, I suspect he might have at least a third career in him. And he still looks younger than, you know, young enough to be my son and that hasn't changed in the 18 years we served together. He's been with all of us on the bench this morning for all the time we've been here including Judge Dyke who's been here almost 20 years I think and I've been here 18. And Reggie was here when we got here and his service to the court has just been unprecedented. You all see what you see but so much goes into whatever we do, making our lives smooth, making us do our job the way we're supposed to do it and that's all Reggie. And he served us when he's done monumental work for us when the court has traveled. You have no idea when we were in LA we sat in seven different locations at one time and he forgave me for that. It took a little while. And I just like to express to him he needed an audio because he's also in charge of the audio stuff so I wanted to make sure that he had a public record. I wanted it's been for to have him serve with us these many many years and to say that he will be missed is the understatement of the century but we're still not letting him go entirely no matter what he pretends. So you will have not seen the last of Reggie and we love you. I can only second what Chief Judge Crowe said. Reggie thank you so much for all your help. You've been terrific. You make this court a special place and we're all very very appreciative. I agree with both of my colleagues. I don't even know what to say. It's with just such a heavy heart that I'll say goodbye to you. You've just been a great friend to me and the whole court and you know I mean if you weren't a cowboy's fan you'd be perfect. So we'll begin this morning. Custom Media Technologies versus Dish Network. As colleagues know and we appreciate your cooperation in this we were faced with four separate appeals which seemed an inordinate amount of time given the issue. Sometime we have one case and it consumes 12 issues so we've divided up the time a little differently and you may not even need as much time as you have but obviously our questions will determine where we go. So we welcome you this morning. The first two cases which are combined for argument as I said are Custom Media Technologies 18-2239 and 18-2240. Mr. Mort whenever you're ready. May it please the court. I'm Ray Mort. I represent Custom Media. The claims of the 090 patent claim a specific new way for the network to control a reserved storage section of memory on a remote user's device. This departed from the prior art traditional methods where the systems like Logan and Hertz would have a storage capacity on the user's device where it could store anything. The advertisement maybe other data programs and so forth would be stored on a single disk. So the heart of one of the issues at least a principal issue is claim construction. So you want to and if we reject your claim construction argument I'd like to understand how that affects your 101 art issue. Well yes because I think if you reject it it affects the 102. I don't think that it rejects the 101. Throughout the prosecution it was demonstrated that we have improved the pirate systems. Maybe height anticipates us but we still meet 101 because we've improved the system. The examiner I mean it took 10 years and he said he finally caught on. He misunderstood how we were using the phrase reserve. The district court and dish in their briefing said reserve meant only. That's what we meant it to be in the prosecution. We agree with that. So the examiner recognized that the improvement was the ability of the system to guarantee that. No. So let me just correct. The board it's they rejected this notion that it's exclusive. Right. But they tied it to their understanding that it was the memory that they believed that we were asserting had to reject the storage of advertising data. That was never our argument. They misinterpreted our argument and they effectively rejected it because I don't believe they understood it. What we said is it's the receiver itself the processor on the receiver. When the data comes in it determines where that data is going to be stored. The memory itself is dumb memory. It'll store anything that you happen to put there. The board said we don't read the claim as saying that the memory has to have some special structure that precludes it from receiving advertising data. Well we agree with that. What it is is a processor that prevents that data from going to the memory because the memory can't reject it. So that was our improvement. That was the misunderstanding. That's what the examiner thought throughout the prosecution until he said he finally caught on that our reserve was more narrow and it assures that there's space on the disk. But the board's construction continued to reject what you just said here your analysis. Well they said I don't believe that their construction makes much sense frankly because they say that there is no exclusivity requirement. If there's no exclusivity requirement then there's no reservation. It's just an open-ended system. We have to differentiate. We have an open-ended system that will store anything to our claim. There's a difference between the two. If you us and an open-ended system. It's this processor that sits in the middle that decides where the data is going to be stored. The board believed that there was this other option that we were arguing which is the memory itself somehow guards itself. That's not what our position was. So the board said oh it must be something over here but that evaporates the meaning of reserve from the meaning. In your response to the examiners objection when you added the word only it sounds as though you described this is at 2101 and the following of the appendix it sounds as though you described the term only as meaning the same thing as what you now say the word reserve means. Well that's exactly yes and what I will point you to. Well if that's the case then how can it be that since the examiner refused to allow you to use the word only that you can accomplish the same thing simply by using a different word. Because we're not the examiner thought that the use of the word only meant that the memory itself was somehow incapable of storing memory of data. This is the same thing that came up in the district court. If you look at the district court claim disruption order he interpreted that amendment the way the examiner was reading it to mean that the memory was unusable to store anything else. It was incapable. Dish in their briefing to the district court said that reserve meant only. That that's what it meant and I'll just point you to it. This is the JN 13 applicant stated that the storage sections are created to store only advertising data and emphasize that the storage sections are adapted to store only the advertising data that was created. So the applicant explicitly quoted the dictionary definition of reserved and to define reserved storage kept only for advertising data to show that reserved and only have the same interpretation. That's JN 14. So Dish is telling the district court that they have the same meaning. The district court understood and understood that the amendment that was before the examiner was being interpreted to mean that the memory was incapable of storing anything else. He finally says in the APX 2404 that he was slow to catch on. That he finally realized that that's not what was there. To give support for that if you look at claim 56, claim 56 uses the word exclusively. So the examiner recognized and this goes back to advertising data. I'm not giving that patentable weight because there's nothing doing anything. You haven't changed anything. You just happen to be using it that way. We then demonstrated to him no we do have support for that and then in the APX 2402 he finally recognized it and that's when he said yes I've given you structural. It is structural. I've given you patentable weight for it. It's statutory under that it has meaning. So that's why it took 10 years. My problem with your argument is that even if I accept as correct the claim construction you seek, I still think the claims are properly held and eligible under 101. So that's my problem with your argument because you've made it clear that you're not claiming a new form, a structural change to memory. You're just claiming a processor programmed to divert things or not divert things. So you haven't claimed something structural like in EnFISH to affect the computer and I just don't see. So I'll just grant you your claim construction and start from that proposition. I don't see how your claims are eligible. Well so I would disagree that they're not structural. So there's a structural change in that the processor is programmed to perform differently. So the process but no that's software. There's a difference between software and hardware my friend. You know you said the memory is not structurally segregated in that way so that would be structural but the software is just directing things to or not to particular memory units is what you're claiming under your construction. I don't see how that's an eligible improvement to computer functioning as a pros to an improvement in targeted advertising. Well I mean just this past month the KPN case came out and it changed the check data and how it was generated. There was no hardware change. There's no structural change but the software was changed to make the system more reliable. Well software can be changed. You argued in your brief that this improves computer functionality. I don't see how this improves computer functionality for that matter. I don't see how this change applies outside the targeted advertising context. NFISH involved a new storage mechanism that would apply across different software platforms. You don't have that kind of improvement to computer functionality. I'm basing my questions to you off your brief. You argued it improves computer functionality. I don't see how that's true. So the improvement is that it improves the reliability of the system to conduct the targeted programming. So if an advertiser is trying to send advertising down to the storage unit and there's no available memory then it becomes inoperable. It's functionally unreliable. What we do is... The computer's not unreliable. It's just you're not going to receive the advertising that you want. That has nothing to do with computer functionality. That doesn't improve speed and efficiency, reduce memory usage of the computer. It only ensures targeted advertising. Well I mean if you want to look at your patent we can do that at column 30. Let's start at line 57 where you talked about the efficiencies that are achieved. They're all efficiencies related to targeted advertising. They're not efficiencies related to computer functioning. Well if the computer can't store the data that you're trying to provide it then the computer is defective in that sense. You haven't claimed new memory or a new processor. You're just claiming routing. A routing. A switch. Routing things to and from a particular memory. But you're not even claiming a switch in the hardware sense. You're just saying software will hold in a reserve certain memory. I don't... Well that's true. It's an abstract idea to me. And the benefit to the system is the ability to ensure the operation of the system. In the KPN case the issue was that it was unable to detect systemic errors. So it used a time varying function that allowed it to perform better. It didn't change the system itself. It just allowed the operators of the system to detect, hey we're having errors. We need to change something. So there was no structural change there. The computer wasn't able to transmit the data without errors. It was just simply able to detect the errors. So it made the system more reliable in that previously undetected errors could be found. What we are providing is a system where the prior art would fill up. And we do talk about in the prosecution that by providing a dedicated area of memory that the network can access did improve the speed of access of that data. That's an APPX 11. Let me pull it up for you. So if you go to APPX 10, 12, and 10, 13, we do talk about... 10, 11, and 10, 12. We do talk about the previous systems would be slower and that we would be faster. Now it's not in our specification that way, but it was described that way to the examiner multiple times. And it's because for whatever it is, if you have a large disk that's filled with whatever data, that when it's time to do the advertising, you have to go hunt around and find where you put it. So we do have a dedicated area that's under network control that has a known location so that when the advertising pops up, it's able to access it faster. The examiner did at first not see that it was structural. And that was in APPX 1202. And we pointed that out to him through the prosecution. And then in the notice of allowance, he did demonstrate that he noticed that, yes, this guarantees that there's some always available, and therefore the system is more reliable. In the follow-on case, they amended the claims in light of Alice and said that this does improve the functioning of the computer. And notice that this was the inventive concept of the patent. Okay. You're into your rebuttal. I want to hear from the other side. Thank you. Good morning. Good morning. May it please the court. I'll start with the 101 issue. But before I do, I think it's worth pointing out that both of the cases that are before the court today are patents sharing a specification. And they both went through the covered business method review program of the PTAB. It's patents like this that justified Congress's decision to implement the covered business method review program. This is the heart of what that program was all about. Why don't you get to the case and not pontificate? Sure. Here we have computer implementation of this fundamental economic practice of targeting advertisements to end users with no new technology that's described, that's claimed. The specification describes all of the technological features as being preexisting in the art. To get to, I think, the heart of what now is being argued to be the technical feature, which is the processor's ability to somehow control storage in some way, I'll just point to what's actually described in the specification. Because there is no discussion of the software that supposedly implements this new technological feature. So even in, you know, again, I take Judge Moore's point that there's a clear difference between software and hardware in both Alice and this court's case law following Alice. But when there are software inventions that get, you know, discussed in the context of 101 where there's some possibility that they might be eligible, it's always where there's a clear description of what the algorithm actually is. What's the new thing? That's not here. When you look at the specification at, for instance, in the 090 patent at column 31, line 44, where this idea is introduced. And this is, by the way, this is the discussion in column 31 is the one addressing these, what the inventor called multi-layered advertising formats. And there's, I believe, nine of them. Number seven is the one that's actually an issue in these claims. And that starts around line 44. All it says is it's programmable designation of advertising sections. I mean, it's, that's it. That's literally what we're hearing today is the invention is just the fact that it's, you could programmably designate certain areas of memory as being for advertisement. Okay. That's obviously an abstract idea. There's no discussion of how they're doing that, what's new about that. And I think it's important to note that the PTAB did, I think, a really excellent job of going through these arguments and showing how none of these things are actually new in any kind of way. So, for instance, if we look at the final written decision in the 494 patent, keeping in mind that, you know, the same APJ wrote, just wrote the final written decisions in both the 099 and 494 cases. There you'll see at page A109, Phoenix page 109, the board addressed, I think, the heart of this issue. Judge Petrovich noted there, the claims merely invoke computers as a tool to implement the concept of targeted advertising and are not directed to any improvement. The recited, and then I'll go on a little bit, the recited functionalities, reserving storage space for advertising data, as well as selecting advertising data for targeting the users, are basic and routine. The board's factual finding was that this notion of reserving storage was old and well known in the art. There's nothing there that you pointed to as being a technological invention. And additionally, on page A114, the board went on to note, we are persuaded that the recited storage device in space, processor and software, are generic components present in computers and many other electronic devices. We are further persuaded that the reservation of storage space, as well as selection and storage and accessibility, are basic functions of these components. So these are all well-known traditional computing functionality. There's no contribution to computer engineering or computer science in the specification or the claims. Instead, this is the prototypical case of using conventional computing components as a tool to implement a business practice. And that's invalid under 101, under any case that they want to point to. No one has ever said anything other than that. Well, the only case he did point to was KPN. So why don't you explain to me how that applied across all platforms, detecting error, and how it wasn't unique to sort of like a targeted advertising program or something. Right. Well, so then again, I would point to, I think, this distinction of what was new in KPN is that coding mechanism that didn't exist before that allowed now computers to do error, I guess, detection coding in that case. It applied to all types of data transmission. It did, and it applied. So this was not just a specific platform, a specific program, improving a particular program. Like, hey, I just improved Excel. This was like across the computers. Right. I mean, I couldn't say it better myself, Judge Moore. I think if you read Alice and this court's case law implying Alice, this distinction that's drawn is between using computers as a tool to do something abstract versus making some actual contribution to computer science that has broader applicability. And certainly in the case of KPN, I think the argument was made that that had a broader applicability and that it applied to any data and was doing it in a new, unique, specific, concrete way that was not in the prior art. There's none of that here. Here, it's a very abstract idea. I want to reserve storage for advertisements, which, by the way, wasn't even new, and it wasn't new as shown by the prosecution history itself, and the PTAB relied on this. Okay. One last question is for me. 101 covers everything. Yeah. Correct? Yes. So we don't need to even get to 102 if we agree with you on 101. So that's going to be true in both sets of cases today. The 101 case, the 101 invalidation would cover all the challenge claims. So one option that the court might consider is just sua sponte consolidating all four cases and affirming because if you're affirming on the 101 ground, that resolves all the cases and it resolves my cross appeals. So I do have cross appeals pending in both sets of cases because in the IPRs, where 101 wasn't at issue, the board did invalidate all the challenge claims. But as I said, it's my belief those cross appeals become moot if the 101 issues are affirmed in the covered business method reviews. And I'm happy to address any of the cross appeal issues if there's questions. Otherwise, I can reserve the balance. I think we're good. Thank you. I don't want to use your time. I would just like you to confirm if you agree with what your friend just said about the procedural posture of these cases. It would resolve it between the parties. Depending upon what happens outside of this case, who knows if the 102, 103 issues should be determined or not. But I do agree that if you rule against us on 101, that effectively we don't have a case. Thank you. So with respect to KPN, I don't believe that there's any cases that really limit whether or not you meet patent eligibility based upon how broad your claims are. Meaning that if you have your claims are drafted to a specific application of the technology that you're using, that you should not be patent eligible. But if you had drafted those claims broader that you are. KPN didn't address that at all. It just said that you have addressed a reliability problem and you've improved the network's ability to detect an error. Our system improves the system's ability to guarantee that there's always going to be space available for the advertising service to work. You could make it to say something else. It could be like a movie service. It could be a gaming service. It could be whatever. The claim happens to be drafted to advertising. We did not describe in the specification that the data boxes and exclusive access to them would be limited to advertising. We talked about games. We talked about movies. We talked about other services. It happens to be the claims that popped out of this patent are targeted advertising. There are other patents that have issued from this that don't relate to advertising. It's just that that's the scope of our claims. I don't think we should be penalized under a 101 analysis because our application. Thank you. We'll proceed to the next two cases which have also been consolidated.